## 35992. ATLANTIC COAST LINE RAILROAD COMPANY
## *et al. v.* GODARD, Executrix.

DECIDED MARCH 16, 1956—REHEARING DENIED MARCH 29, 1956.

*Kay Tipton, Weldon C. Boyd*, for plaintiff in error.

*Randall Evans, Jr.*, contra.

NICHOLS, J. ■ Special grounds 4 and 5 of the amended motion for a new trial complain of the introduction of testimony regarding one Clarence Bennett, to the effect that he was seen on the defendants' premises on numerous occasions in 1938; that he stayed in and around the depot waiting room for about six weeks; and that subsequently he burglarized a grocery store across the street. The objection that this testimony was too remote in point of time is not well taken for the reason that the plaintiffs were showing a series of incidents extending from that time up until the attack involved in this case to show that lawless characters, prowlers, and hoboes frequented the area. By itself it might be too remote to sustain a recovery, but its admissibility, in connection with other testimony as to more recent occurrences, is beyond doubt. It was not irrelevant or immaterial as not being illustrative of the issues involved.

■ Special grounds 6, 7, 8, and 9 complain of the admission of evidence by non-expert witnesses substantially similar to that set out in division 4 of the opinion in *A. C. L. R. Co.* v. *Godard,* supra, as to the physical condition of the deceased from the time of his attack until his death. Objections to that testimony, or very similar testimony, were held in the 4th division of the opinion in that case not subject to the objection that it was a conclusion because "the conclusion of a non-expert witness, or his opinion, is admissible when predicated upon facts stated by the witness." This disposes of the objection that the testimony was inadmissible because it was not such testimony as may be given by a non-expert witness. See also *American Fidelity &c. Co.* v. *Farmer,* 77 *Ga. App.* 166 (17) (48 S. E. 2d 122). As to the foundation laid for the opinions given, E. A. Baker, Jr., testified that he visited his

father during the years preceding his death, had knowledge of his general health, knew the condition of his general health prior to the assault, observed his apparent condition at regular intervals after his assault, knew about his appetite, habits, bruises, complaints, and so on before and after the beating, and was able to form an opinion from these facts as to its effect on him. Mrs. E. A. Baker, Sr., gave similar testimony, adding that she lived with him continuously before and after until the time of his death, waited upon him constantly, and formed her opinion based on these facts. Accordingly, the testimony was not subject to the objection that no foundation had been laid. The witnesses also testified as to physical observation of the deceased, the location and general appearance of the marks inflicted on him, and his activities before and after the injury. These grounds are without merit.

■ In special ground 10 error is assigned on the introduction of four railroad rules, one of which provides that station agents must promptly advise the superintendent of all local matters which may affect the interests of the railroad, the grounds of objection being that the rules were irrelevant and immaterial. This rule might have had some slight relevancy, though little materiality, on the issue of notice by the defendant of prior law violations on the premises. However, the admission of irrelevant and immaterial evidence not of such harmful character as that its admission taken alone would be cause for reversal will not cause the appellate court to grant a new trial. *Crawley* v. *State*, 150 *Ga.* 586 (2) (104 S. E. 410).

■ The admission of medical bills, contended to be erroneous in special ground 11, was justified by sufficient medical testimony to authorize the jury to find that the treatment necessitated, to which these bills made reference, was at least in part occasioned by the beating, and was not wholly attributable to illness resulting from cancer. The jury could also have found from this testimony that the cancer was aggravated by the beating. Evidence as to these medical expenses was accordingly admissible.

■ An assignment of error merely that the court erred in failing without request to charge "the measure of damages for the decreased earning capacity to labor and work in the event the injury was not permanent," without setting out in substance what it is

contended the court should have charged on this subject, is too vague and indefinite for consideration. *Spence v. Morrow,* 128 *Ga.* 722 (1) (58 S. E. 356) ; *Paulk v. Speer,* 143 *Ga.* 621 (2) (85 S. E. 867) ; *Jones v. Stokes,* 145 *Ga.* 745 (3) (89 S. E. 1078). Ground 12 is without merit.

■ In special ground 13 it is contended that the court erred in charging as follows: "I charge you that the general rule that an intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence does not apply where it is shown by the evidence that the defendants had reason to anticipate the criminal act, and whether or not the defendants in this case had reason to anticipate the criminal act of a third person with whom they had no relationship whatsoever and over whom they had no control whatsoever, if such be the case, is solely a question for the jury to determine under the evidence in this case." Since the Supreme Court on the previous appearance of this case (211 *Ga.* at page 377) stated: "The general rule that the intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence does not apply when it is alleged that the defendant had reason to anticipate the criminal act." In answer to the defendant's contention that its only duty being to exercise ordinary care, this charge placed upon it a burden greater than that required by law, it can only be said that it has already been established in this case that, upon proof of the acts of negligence alleged, it must be concluded that ordinary care under the circumstances included the duty to anticipate a repetition of criminal acts and to take measures to guard against them. This ground is without merit.

■ Special ground 14, contending that the verdict of $6,000 was grossly excessive, will be considered in connection with the general grounds. The testimony relative to the essential allegation that the defendant railroad company had reason to anticipate criminal acts of third persons on its premises because dangerous characters, hoboes, and prowlers frequented the area and the defendants, with knowledge thereof, failed to take precautionary measures, is substantially as follows: L. B. Chambers testified for the plaintiff: "There is a gin house property located in the general vicinity of the Georgia Railroad station, about a block from it. . . I have been around the gin house at night. In my visitations to the gin

premises I have not noticed hoboes or dangerous characters there. I don't think I have been there when we would be ginning cotton at night. I haven't made any particular observation of the depot to determine whether hoboes hang around it at night. I do not know whether hoboes hang around the depot at night."

George P. Saye testified for the plaintiff: "This is the 19th year that I have been sheriff of Morgan County. Part of my duties is to apprehend persons violating the law. I am familiar with the Georgia Railroad as it runs through Morgan County and know where the depot is in Madison. During my tenure in office as sheriff I have had occasion to apprehend persons violating the law or charged with stealing from the railroad. I can recall one of such instances but I am sure there must have been more than that. I did not apprehend him. He was apprehended in Augusta and turned over to me. I brought him here to the county jail. This involved the railroad property in this county. The county authorities in Augusta contacted me about taking charge of it. As to my knowledge of whether the officials of the Atlantic Coast Line—this particular line, knew about that; they were not there when we were talking to him about it. I guess they did. I couldn't say off-hand what year it was. I think it was about ten years ago; maybe more than ten. . . We had one other case involving the railroad. The seal was broken and some merchandise taken out of the car. I can't recall the name. The seal is put on a railroad car so you can tell if anyone goes in there. The seal has to be broken if it is opened. This was before the war. . . In my business as sheriff I consider it one of my duties to watch for strangers and suspicious characters and identify who they are and where they came from. In my 18 years I have seen such characters as that around the Georgia Railroad depot in Madison. I have seen it more than one time. As to the places in Madison where I have seen suspicious people, I would not pick out any particular place where I have seen more of them than any other place. I have seen them at the depot and at other places too. I have seen them at the depot numerous times. I have seen them daytime and night-time. . . As to how long prior to July 23, 1951, it was that I saw the last man, I have seen people there every day since I have been in office and have talked to them personally. I did not know them. Off-hand I couldn't recall the names of any

persons I talked to. As to the dates when I talked to any of them, I have talked to people at the depot every year since I have been in office. I could not single out any individual and say I talked to him on a certain date, I didn't keep any records. In the normal course of my investigations, I talked to strangers at the depot prior to July, 1951. As to whether I talked to them just as I would if I ran across a stranger up-town, I stop some on the road, I do that as a part of my job, the best I know how. I don't recall talking to someone right after the burglary at the depot but I questioned people. While I have general supervision of law enforcement, one of my duties is to serve warrants on charges brought by other people. I don't have stated rounds to make and do not have occasion to be patrolling any particular part of Morgan County at any particular time. I go over the county. I don't have a regular route like the Georgia Railroad station or any other particular place. . . As to suspicious characters around the depot and as to what were some of the things about a stranger at the depot that makes him look suspicious, sometimes the way they dress and sometimes the place he is at. As to whether they are dirty, I have seen them dirty. A man dressed up in the waiting room, I would not call him suspicious. I have seen them when their clothes were unkept. There was not a big drove of that class. I have seen them often—not every time I go down there. The fact that they were strangers would not indicate they were lawless persons—it is not the dress I go by. A combination of things, being a stranger, being around the depot, being dressed shabbily, all those things would indicate he was lawless. As to its being a matter of common knowledge in recent years prior to July 23, 1951, hoboes were kind of a thing of the past, nothing like what they were way back. You see more on the highway now than about the railroad. With references to any of the so-called characters I had occasion to stop and talk to, as to whether I would have made an arrest if I had any indication that the law was violated, I would have held them on suspicion. If there had been any indication in my mind that they would have been law violators I would have made a case."

Hugh Morgan, called by the plaintiff for cross-examination, testified: "I am employed by Georgia Railroad and was here in Morgan County for a time. I came here in 1933 and I believe it

was 1946 that I left. During the time I was here I was night operator at the depot down here. After that I worked on railroads as station agent or operator at other places. I have been working for the railroad since 1913. In that length of time I became experienced in the operation of railroads. As to whether I know whether hoboes ride the Georgia Railroad, yes. As to whether I do know whether they ride through Morgan County (and would be around the depot in Morgan County) from time to time, yes. While I was working there at night I did take precautions to protect myself. I always had some kind of gun in the depot. I felt it was a necessary precaution."

I. B. Cooper, called by the plaintiff for cross-examination, testified: "I have seen some hoboes riding trains through Madison. I don't believe I have ever seen them alight from the train. As to whether I have seen persons around the depot that were dirty and dangerous looking, I don't go to the depot so much at night. In the daytime, without seeing any person get off the train, I have seen them pass through during that time, as station agent. I would not say as long as I have been at Madison I have seen them on the ground, dirty people, unclean strangers, people I didn't know."

Francis Burge testified for the plaintiff: "I am connected with Morgan County in an official way as County Police. I have been County Police since 1941. In my job as county policeman I have an interest in trying to see what goes on in the way of strangers that come through the county. I know where the Georgia Railroad is located and where the Georgia Railroad runs through Morgan County. In my official capacity as county policeman, I have been called to the Georgia Railroad premises during my tenure in office. As to how many times I would say I have been called there, well, I haven't been called as much since I have been county police as when I was city police. As to how many times I have been called when I was city police and county police together, when I was city police I was called a good many times; I didn't keep any record. Mr. Hugh Morgan, the station agent, would be the person calling me to come there. He would call me to come to the Georgia Railroad depot and I would go. As to whom I would find on some of those occasions, he called me about suspicious people, hoboes. It would be at

night, I found those persons there. Some of them were hoboes, persons who had been riding trains into Madison. I would say the majority of the persons that I came there to see and did see were strangers that I did not know. Some were dressed poorly, some would have a bag and some two bundles of clothes and they were dirty. I recall on several occasions there were some off the train that would have grease on them and cinders and different things on their clothes. Since being county policeman I have had occasion to go to the depot and see people but not as much as I have before. My job as county policeman covers a wider territory whereas a city policeman was located in Madison. I said I had been county policeman since 1941. It was prior to 1941 that I was city policeman. I couldn't give you the exact date. I started with the city and left the city and went with the county. I would say it was the latter part of 1938, 1939 and 1940 that I was with the city. As to whether in those years it was not uncommon to see hoboes and tramps, etc., generally roaming about the county, you see them in a lot of places. As to my speaking of my having got somebody off the train, I would say that was in 1946. I talked to a lot of people that there was nothing wrong with. In cases I would see a stranger that would put me on notice that he was a stranger and I wanted to find out his business and I talked to him and satisfied myself he was all right. The last time I had occasion to talk to some person around the Georgia Railroad premises before July 23, 1951, I would say was back around 1950. I haven't got the records but we got three people off the passenger train that gave bad checks in Madison. I took them off the train in Madison. They boarded the train in Greensboro and were en route through Morgan County. Before that I don't remember when I had occasion to talk to some person in that vicinity or the premises of the Georgia Railroad that was unknown to me. I don't keep a record of them. There is no way for me to identify and say who I talk to or when I talk other than to say that during the period of some twelve or thirteen years prior to 1950 I did talk to some people down there. The ones I talked to and no case made, there was no record. The only record we have unless I go back and get it, would be the one I took off the train. On two occasions I have taken them off the train, forgery and a hoboe. That was in 1940. At the time I apprehended him he was on the train and I pulled him off

the train also. He had locked the train brakes. Other than those two occasions, the sheriff, myself, and I believe one of the city policemen raided a negro woman in the depot with some whisky. Her baggage was checked, going either to Greensboro or Atlanta, and we got the suitcase. Mr. Baker was there. What we found was in her baggage, in her suitcase."

G. B. Patrick testified for the plaintiff: "I am Chief of Police of Madison, Georgia, and have been such since 1948. In my capacity as Chief of Police I have had occasion to visit the depot in Madison. I go down there every morning. I have gone down there at night some of the times but not often. When I was night policeman I went every night. From 1935 to 1944 I was night policeman before I became Chief of Police. During the time I have been night policeman and Chief of Police I saw hoboes at the depot, plenty of times. The station agent was present. He could see. On one particular occasion I do recall the McDowell incident where some goods were taken from McDowell's. I remember seeing the person who did it. He stayed there in the depot. With reference to Clarence Bennett, I saw him in the waiting room at the depot. I couldn't name the times; he was there almost every night continuously, I would say, for six weeks in the depot. I saw the station agent there during the time he was there. As to whether he was close to the station agent, well, he would always go in the waiting room. There is a window that opens from the waiting room into the place where the station agent stays. There was a passenger train that came along during the periods of time I would see him in there. From the position where the station agent would stand at the window he would be able to see the waiting room. He was a man who could see. He was in there for a period of six weeks. He was a stranger. He left there and went into the country and stayed there two or three weeks. . . I testified that I had seen this Clarence Bennett in the station waiting room for some six weeks. The reason I didn't arrest him was because I had no evidence he was a lawless character. As to whether it is true that at the time I did pick him up he was living in the country, yes, after the place was broken into, the place was broken into after he moved out in the country. He moved out in the country some time prior to 1938. I have been Chief of Police since 1948."

George P. Saye, recalled for the plaintiff, testified: "As to M. C. Hayne being on the back of the indictment, I know who he was. He worked for the Georgia Railroad in the capacity of detective or investigator. He took an active interest in the prosecution of this case. With reference to my mentioning that Mr. Hayne was present in court and took an active part in the prosecution of this case, I can't recall the names of any other representatives of the railroad present in court, but there was more than one here. Mr. Hayne helped make the investigation. I heard Kellis Statham, who pled guilty, testify. Mr. Hayne and I both were working on the investigation and trying to convict the negro who was pleading not guilty. We were using Kellis Statham as our witness against the man who was pleading not guilty. Mr. Hayne and I talked with Kellis Statham before he testified and we had a fair idea of what he was going to testify to. Mr. Hayne was here. He could hear. He was near enough to hear what the witness said. I heard him. As to my recollection of whether or not the witness testified where the box car that he broke open was located, I said yesterday it was near the depot. Off-hand I can't say who located him in a foreign state before I went for him. Mr. Hayne, the railroad detective, told me where to get him. I would say this transaction I am talking about took place around 1941. As to my not having any independent recollection of the date other than what this record shows, I couldn't pin-point it yesterday, but there it is there. Unless I read the record I would not pin-point the exact location of the railroad car as testified to by Statham in May, 1941, other than what I said yesterday, it was very near the depot. If I hadn't seen the record, I would not attempt to say where that negro placed the car exactly in his testimony. Without reference to exactly, I do have an independent recollection that he did place it near the depot. It was before Mr. Baker was hurt. I would say it was a night-time robbery."

When this case was before the Supreme Court it was reversed on the general grounds because the evidence was insufficient to support the allegations that the defendants "well knew that dangerous, reckless, and lawless characters and persons who were strangers frequented the premises described during the nighttime, including prowlers and hoboes." The evidence on this trial is set forth somewhat in detail in order to demonstrate that, although

some of it was somewhat remote and some immaterial to the issue, yet there is sufficient evidence to constitute a jury question as to whether or not the facts alleged in the specification of negligence above set out have been established. The record is replete with evidence that hoboes frequented the premises of the defendant railroad over a period of years, both day and night. Hoboes as such are law violators (Code § 18-9912). This evidence, coupled with other evidence in the record, is sufficient to support the verdict. As to the amount, $6,000, the defendant contends that, since there was no medical treatment between August, 1951, and March, 1952, and since the plaintiff returned to work on November 26, 1951, and worked through February, 1952, all expense and disability subsequent to that date should not be charged to it, but should be treated solely as resulting from the cancer; that, under such circumstances, the plaintiff would be entitled to about $1,200 in actual damages, leaving $4,800 which it is contended was awarded for pain and suffering and was grossly excessive. Neither of these contentions is sustainable. This court would be loath to say that an award of $4,800 for pain and suffering was "so excessive as to justify the inference of undue bias." Code § 105-2015. Also, there is evidence which would authorize a finding (a) that the onset of the cancer was simultaneous with the beating, or (b) that it was aggravated thereby. Accordingly, the verdict in the amount returned was authorized by the evidence, and the general grounds of the motion for a new trial are without merit.

The trial court did not err in denying the motion for a new trial.

*Judgment affirmed. Gardner, P. J., Townsend, Carlisle, and Quillian, JJ., concur. Felton, C. J., dissents.*

FELTON, C. J., dissenting. The gist of the action is that dangerous characters, hoboes, and prowlers frequented the area where the deceased employee worked (as alleged in paragraph 20 (a)), and that the defendants had knowledge thereof and failed to take precautionary measures. I do not think that the evidence supported the conclusion that the premises were frequented by such persons as those alleged so as to require the defendants to guard against the consequences thereof.

G. B. Patrick, Chief of Police, testified that Clarence Bennett burglarized McDowell Grocery Company ten or more years ago; that he was seen on the defendants' premises on numerous occa-

sions in 1938; that he had no evidence that Bennett was a lawless character; and that the burglary was committed after Bennett left town and moved to the country. There was no evidence that Bennett was a lawless character in 1938 and no competent evidence that the defendants knew of the later crime charged against him or had any reason to remember his actions in 1938 and connect them with his later lawlessness. The sheriff testified with reference to charges made against Kellis Statham and Willie George Tensley arising out of their robbing a freight car near the depot. Even if the evidence had placed this isolated crime on the depot premises where Mr. Baker worked, the evidence of one burglary would not support the charge that the premises were frequented by such dangerous characters. The three forgers and a hobo taken off trains and the finding of whisky on a negro woman in the depot are not relevant to the issue involved. There is no other evidence in the case upon which a jury could base a finding that the premises were so frequented by dangerous characters, hoboes, and prowlers as to require the defendants to anticipate criminal acts by such persons and guard against them by taking appropriate precautions.